**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| Tina W., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50244 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff is seeking Social Security disability benefits based primarily on her rheumatoid arthritis ("RA") and fibromyalgia, but she also suffers from gastroparesis, diabetes, irritable bowel syndrome, degenerative disc disease, osteoarthritis, bursitis, obesity, anxiety, and depression. These impairments, according to Plaintiff, cause a host of debilitating symptoms, including joint pain and swelling, nausea, headaches, fatigue, insomnia, and blurred vision, all of which would allegedly make it impossible for her to work full-time. The administrative law judge ("ALJ") disagreed, concluding that Plaintiff could do a reduced range of light work. The ALJ's central rationale was that Plaintiff's allegations were not corroborated by the medical record. This rationale performed double duty, providing a reason to discount Plaintiff's credibility and also a reason to discount the opinions of two treating physicians. (There were other reasons as well.) The Court finds that this rationale was supported by substantial evidence and that there are no other reasons to second-guess the ALJ's decision.

## BACKGROUND

The medical record is complex, in part because Plaintiff has many impairments, several of which are difficult to diagnose and treat, and in part because Plaintiff saw numerous doctors

1

over the relevant period, which runs roughly from mid-2015 until mid-2018. The treating

physicians during this time included:  Dr. Frederick Dietz (rheumatologist); Dr. John Hovis

(endocrinologist); Dr. James Woodman (primary care physician); Dr. Igal Breitman (weight loss

surgeon); Dr. Jorge Villacorta (primary care physician);  Dr. Stephen Kozlowski

(rheumatologist); Dr. Sravanthi Nagavalli (endocrinologist); and Dr. Jan Skowronski

(cardiologist).[1] In addition, Plaintiff saw several nurse practitioners, and was also evaluated by

two consultative examiners, Dr. Julie Young (psychologist) and Dr. K.P. Ramchandani

(internist). This Court will not set forth a visit-by-visit summary of the medical history. Both

Plaintiff's opening brief and the ALJ's decision provide detailed summaries.

The administrative hearing was held on May 21, 2018. Plaintiff, represented by her

present counsel, testified about her limitations and activities. A vocational expert then testified.

No medical expert was called to testify.

On October 12, 2018, the ALJ issued a 17-page decision finding Plaintiff not disabled. At

Step Two, the ALJ found that Plaintiff had the following severe impairments:  "fibromyalgia;

rheumatoid arthritis/nonarticular rheumatism; degenerative disc disease in the cervical spine;

bursitis in the bilateral hips; osteoarthritis in the right hip; diabetes mellitus; migraines;

gastroparesis; and obesity." R. 29. However, the ALJ found that Plaintiff's Achilles tendon

repair, irritable bowel syndrome, depression, and anxiety did not qualify as severe impairments.

R. 29-30. At Step Three, the ALJ found that Plaintiff did not meet several possible listings.

Plaintiff does not challenge either of these two findings. In the RFC discussion, the ALJ first

summarized the medical history at some length (offering some limited commentary along the

---

[1] A careful reader might note that this list includes several doctors in the same specialty (*i.e.* two rheumatologists, two primary care physicians, and two endocrinologists). It appears that Plaintiff switched doctors several times, but the briefs do not explain why.

way) and then analyzed Plaintiff's credibility and finally considered the medical opinions. The ALJ relied on the opinions of the State agency physicians, who found that Plaintiff could do light work, and gave no or little weight to opinions provided by Dr. Woodman and Dr. Kozlowski.

## DISCUSSION

Plaintiff's main argument for a remand is that the ALJ erred in rejecting the opinions from the two treating physicians. This argument takes up eight pages of the argument section of the opening brief. The last three pages consist of a series of shorter, one-paragraph arguments. Given Plaintiff's emphasis, the Court will focus mostly on the first argument. But before doing so, the Court will first discuss the ALJ's credibility finding. Plaintiff has not directly challenged this part of the decision, although parts of her treating physician argument indirectly relate back to it. In this Court's view, the credibility finding is the pivotal part of the decision because it ties back to the medical opinions, as will be explained below.

## I.     The Credibility Analysis

In the credibility discussion, the ALJ reached the following overarching conclusion:

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because much of her testimony is uncorroborated by the objective medical records detailed above and documented in the evidence of record. As noted above, the claimant's complaints at the hearing were significantly more severe than those described in the treatment notes. While it appears that the claimant has suffered from increased pain due to [an] RA flare at the beginning of this year, the claimant's allegations regarding the frequency of headaches, nausea, vomiting, severity of neuropathy, diarrhea, and difficulty walking due to cardiac complications are wholly unsupported, which significantly lessens the persuasiveness of her testimony.

R. 38. The Seventh Circuit has repeatedly held that ALJs are permitted to discount a claimant's credibility based on this type of inconsistency rationale. *See, e.g., Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) ("The ALJ permissibly discounted Zoch's testimony of incapacitating pain because it conflicted with the objective medical evidence and most of the record."); *Jones v.*

*Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration.").

Of course, there must also be substantial evidence to justify the conclusion. Here, the Court finds that the ALJ, in fact, did point to substantial evidence, especially given the deferential way that standard has been construed. *See Recha v. Saul*, __ Fed. App'x. __, 2021 WL 164914, *3 (7th Cir. Jan. 19, 2021) ("The substantial evidence requirement does not present a high hurdle: the ALJ's decision need only identify 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)).

The ALJ concluded that Plaintiff had only sporadically complained about many of her symptoms and found that this was inconsistent with her later testimony that these symptoms were frequent and unrelenting. The ALJ reasoned that, if Plaintiff's problems really were as severe as she claimed, then she likely would have mentioned them more often and would have more vigorously sought medical solutions. The ALJ also thought that Plaintiff's activities, in some areas, were inconsistent with her allegations. Among other things, the ALJ noted the following discrepancies:

- **Diarrhea and Bowel Problems.** At the hearing, Plaintiff testified that diarrhea was a constant problem, causing her to run to the bathroom seven to ten times a day. R. 66. However, the medical records showed that Plaintiff "rather consistently" denied bowel problems. R. 39.

- **Blurry vision.** Plaintiff claimed that she had blurry vision on a "daily" basis, but she only reported it "once to Dr. Woodman in May 2017" and then "never followed through with the ophthalmology referral and failed to continue to report blurred vision at subsequent visits with any provider." R. 39.

4

- **Depression and anxiety.** Despite claiming anxiety and depression problems, Plaintiff "frequently denied" such problems and "apparently only received treatment for insomnia." R. 39.

- **Leg Swelling.** Plaintiff stated that she had "daily" leg swelling, but she only complained "infrequently" about this problem. R. 39.

- **Nausea and Vomiting.** Plaintiff claimed that she had nausea constantly. *See, e.g.*, R. 66 (testifying that she threw up two to three times every day). However, she often denied having any such problems in her doctor visits.

- **Walking**. Plaintiff testified that she had difficulty walking more than a block, but the record indicated that she "was walking daily 30-60 minutes on a treadmill since November 2017." R. 38.

- **Headaches and Migraines.** The ALJ noted, among other things: "She denied significant headaches in September but then reported daily throbbing headaches for the past 2 months in October. She was prescribed Amitriptyline and then a couple weeks later, she reported reduced frequency of headaches to only 3 times a week[.]" R. 37.

- **"No apparent distress."** The ALJ noted that Plaintiff's doctors consistently found that she was in no apparent distress during office visits, an observation the ALJ believed was at odds with Plaintiff's allegation that she was experiencing high levels of pain in many parts of her body. R. 39.

In her two briefs, Plaintiff has not provided any meaningful rebuttal to the discrepancies regarding nausea, diarrhea, depression, and anxiety. As such, those findings are clearly supported and on their own provide fairly substantial evidence for the credibility finding.[2]

As for the remaining symptoms, Plaintiff has raised a few counter-arguments, but they ultimately amount to requests for this Court to re-weigh the same evidence and reach a different conclusion. *See Johnson v. Berryhill*, 745 Fed. App'x. 247, 251 (7th Cir. 2018) ("Resolving the conflicting evidence about such a close case, in which subjective pain is so critical, is a job for the ALJ in the first instance."). The ALJ did not deny that Plaintiff had ongoing medical

---

[2] The Court acknowledges that the Seventh Circuit has held that an ALJ should not deny benefits on the "sole ground" that there is "no diagnostic evidence of pain." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015). But here the ALJ relied not only on the lack of objective evidence, but also the fact that Plaintiff did not even complain about several of these problems during many visits despite claiming that they occurred on a daily basis.

problems and recurring symptoms. The question instead is how frequent and severe those symptoms were.

Consider Plaintiff's walking abilities. Plaintiff does not contest the ALJ's point that Dr. Ramchandani and others observed her with a normal gait on many office visits. Nor has she provided any meaningful response to the ALJ's reliance on the evidence showing she regularly used a treadmill. In her reply, Plaintiff claims at one point that the ALJ did not cite to the treadmill use to support the RFC conclusion. Dkt. 29 at 3. But the ALJ clearly referenced this evidence several times. *See* R. 37; R. 464 ( "Exercise: -30 min – 60 min on treadmill"); R. 751 ("she gets on a treadmill daily, walking at a medium pace at 30-60 minutes daily"); *see also* R. 828 ("Physical activity:  walking 20-30 minutes a day"); R. 830 (same). Even though Plaintiff alleges that there is other evidence supporting her claim that walking was painful or difficult at times, the ALJ was entitled to rely on this evidence as one part of the overall credibility analysis.

As for headaches, Plaintiff points to some counter evidence but Plaintiff does not challenge the ALJ's main point that Plaintiff did not consistently complain about this problem. Here again, the point is not that there is no evidence supporting Plaintiff's side, but that the ALJ had sufficient other evidence to reasonably conclude in the way he did. In her reply, Plaintiff states that she kept "a very detailed migraine log to the file covering December 2016 through May 2017." Dkt. 29 at 4-5. But Plaintiff has not correlated these observations back to the treatment records to try and rebut the ALJ's broader assertion that Plaintiff did not consistently complain about these headaches to her doctors in a way that was consistent with her allegations. In addition, the ALJ relied on the separate rationale that Plaintiff had been experiencing headaches for years but had still been able to work. R. 33 ("[S]he has had migraines since she was 19 years old, suggesting she had been able to work despite having migraines.").

In addition to the ALJ's lack-of-corroboration rationale, the ALJ also noted several areas in which Plaintiff had been non-compliant with treatment recommendations. This provides an additional ground supporting the credibility rationale. *See Imse v. Berryhill*, 752 Fed. App'x. 358, 362 (7th Cir. 2018) ("The ALJ reasonably considered the impact of Imse's noncompliance []; Imse declined two doctors' recommendations for physical therapy, and when she finally did seek treatment, she failed to follow through.").

One issue was Plaintiff's diabetes. The ALJ noted that Plaintiff's doctors had told her that she should improve her diet and medication compliance. The ALJ noted how Plaintiff had told one endocrinologist that she forgot to use Novolog "many times" and that she was "not checking her sugars as recommended" and "was not using the weight loss app." R. 37. At another visit, a doctor told her that it was "unrealistic [for Plaintiff] to expect to [be] off insulin while drinking 4 regular sodas a day, eating ice cream, pasta, and bread." *Id.* Plaintiff quibbles with a few of these conclusions. *See, e.g.,* Dkt. 29 at 4 ("Though plaintiff admitted enjoying sodas, pasta, and ice cream, there is no indication in the record that plaintiff enjoyed ingesting all of these things at the same time."). Still, on the whole, Plaintiff has not demonstrated that the ALJ was wrong in concluding that, if Plaintiff had been more compliant, some of her problems might have improved. *See, e.g.*, *Weaver v. Berryhill*, 746 Fed. App'x. 574, 579 (7th Cir. 2018) ("This noncompliance [which included non-compliance relating to the claimant's diabetes] allowed the inference that the severity of her symptoms would be diminished if she followed her doctors' advice.").

The ALJ also noted that Plaintiff alleged problems with numbness but did "not take medication for neuropathy and has never been on Neurontin." R. 33. The ALJ observed that Dr. Woodman "gave [Plaintiff] a referral to a gastroenterologist" but she did not "follow through

with that referral." R. 36. Plaintiff has not challenged these facts, nor offered some explanation, such as lack of insurance, to explain away the noncompliance.

In sum, the Court finds that the ALJ offered several valid credibility rationales. And although Plaintiff undoubtedly disagrees with the way the ALJ interpreted the evidence, the Court cannot find that the ALJ's interpretation was unreasonable or that the ALJ failed to consider the relevant lines of evidence. As such, the ALJ's credibility finding satisfies the Seventh Circuit's deferential standard. *See Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) ("We give the ALJ's credibility finding 'special deference' and will overturn only if it is 'patently wrong.'").

## II.    Treating Physician Opinions

The adverse credibility finding is important because the ALJ relied on similar rationales in rejecting the medical opinions. The Seventh Circuit has repeatedly held that an ALJ's finding that a claimant exaggerated her problems may in turn be used to discredit a treating physician opinion if that opinion also relied on the claimant's subjective allegations.[3] Here, it does not appear that either Dr. Woodman or Dr. Kozlowski performed, or relied upon, any functional testing measuring Plaintiff's abilities to do certain tasks, such as walking. This suggests they relied heavily on Plaintiff's subjective reports about her functional abilities. At the hearing, the ALJ asked Plaintiff about functional testing, and she stated at one point that Dr. Kozlowski had asked her "opinion" about how long she could sit and stand. R. 68. This evidence suggests that these doctors were, in fact, relying on Plaintiff's subjective allegations. If true, then under the

---

[3] *See, e.g.*, *Zoch*, 981 F.3d at 602 ("[T]he ALJ noted that Dr. Paluska's opinion relied on Zoch's subjective complaints, [] which the ALJ reasonably rejected as not credible. Thus, the ALJ's decision to give Dr. Paluska's opinion little weight is sound."); *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) ("An ALJ can give less than controlling weight to medical opinions based on subjective reports and can even reject a doctor's opinion entirely if it appears based on a claimant's exaggerated subjective allegations."); *Wilson v. Berryhill*, 737 Fed. App'x. 286, 289 (7th Cir. 2018) ("[T]he ALJ permissibly rejected Dr. Barbour's medical opinion as based on Wilson's magnified and non-credible subjective allegations").

case law cited above (*see* footnote 3), the ALJ could have validly rejected these opinions on this ground alone.

In any event, the ALJ offered additional specific reasons for discounting each of the doctors' opinions. These rationales provide further support for the ALJ's decision.

As a preliminary point, the Court acknowledges that Plaintiff believes the ALJ should have explicitly discussed each of the factors under the treating physician rule, which was applicable to this case. The Commissioner argues that the ALJ merely had to provide "good reasons" for the decision. *See, e.g.*, *Whitehead v. Saul*, __ Fed. App'x. __, 2020 WL 7787038, *5 (7th Cir. Dec. 30, 2020) (affirming:  acknowledging treating physician rule, but stating "an ALJ may discount the opinion of a treating physician [] if [the ALJ] provides good reasons for doing so."). As explained below, the Court finds that the ALJ cited to several "good reasons" for rejecting these opinions. The Court is not persuaded that a more formal analysis of each checklist factor would have changed the ALJ's mind. Therefore, any error is harmless.

The Court will first consider the ALJ's analysis of Dr. Woodman's opinions. He provided three opinions over a five-month period. The first opinion was dated December 21, 2016. It is a one-page letter stating that Plaintiff was "permanently & totally disabled" based on a list of impairments. R. 402. Other than listing Plaintiff's impairments and asserting that Plaintiff was permanently disabled, the letter contains no analysis. The second opinion is one-page letter, dated March 30, 2017, which states in substantive part as follows:

> The above patient has been diagnosed [with] Gastroparesis, Rheumatoid arthritis, and Fibromyalgia. These impair her ability to work as they are unpredictable while requiring recovery time and it is a necessity for her to have access to a restroom at all times.

R. 419. The third opinion is a two-page questionnaire entitled "PHYSICAL Residual Function Capacity Medical Source Statement." R. 421-22. This was a checkbox-style form. Dr. Woodman

gave various assessments about Plaintiff's abilities in functional areas. If accepted in full, this opinion would lead to a finding that Plaintiff was disabled.

The ALJ began his analysis by looking at Dr. Woodman's first opinion. The ALJ gave this opinion little weight because, in addition to being vague, the opinion was given the day after Plaintiff's first visit with Dr. Woodman. R. 40. The Court cannot fault this reasoning. It goes to the first checklist factor, length of treatment. Plaintiff does not have any viable counter-argument. Plaintiff first questions whether this was the first visit. *See* Dkt. 22 at 17 ("[T]here is no clear indication that the December office visit was the first time she established care with [Dr. Woodman]"). But Plaintiff is speculating, without any firm basis. Dr. Woodman's treatment notes state that the December 20th visit was the "FIRST VISIT." R. 410. Plaintiff separately suggests that Dr. Woodman could have relied on treatment notes from a nurse who saw Plaintiff earlier. But this is also speculative. Plaintiff finally argues that Dr. Woodman reached the same conclusion—that Plaintiff was totally and permanently disabled—in his two subsequent opinions rendered after several months of treatment. Plaintiff thus claims that his original opinion "essentially did not change over time." Dkt. 22 at 17. This may be so as to the ultimate conclusion, but some of his analysis did change. In his first opinion, Dr. Woodman did not include fibromyalgia, RA, or gastroparesis in the list of impairments. His later opinions added those impairments. Even if the doctor's conclusion remained the same, the ALJ might still reasonably have questioned whether the doctor was, in effect, being sympathetic to Plaintiff by giving her the initial opinion even though he had just started treating her. In addition, the ALJ also noted that Dr. Woodman's two later opinions were inconsistent with records indicating that Plaintiff's gastroparesis had improved.

The Court next turns to Dr. Kozlowski. He rendered one opinion, which was on the same two-page RFC questionnaire form Dr. Woodman completed. R. 795-96. As Plaintiff accurately states, if accepted, Dr. Kozlowski's answers "essentially ruled out work for Plaintiff." Dkt. 22 at 12. The ALJ, however, found that that this opinion was "not well-supported by clinical or laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence of record, including his own treatment notes." R. 41. The statement harks back to the inconsistency rationale discussed in Section I.

Plaintiff attacks the ALJ's reasoning in several ways. Plaintiff argues that the ALJ should have given Dr. Kozlowski's opinion weight because he had a treating relationship. Yet, as Plaintiff implicitly acknowledges, this length of this relationship (about four months) was not especially compelling. Plaintiff attempts to shore up this weakness by arguing that Dr. Kozlowski "had access to his colleague, Dr. Dietz' records with the same treatment facility going back to 2015." Dkt. 22 at 15. The implicit assumption is that these doctors made similar assessments. But Plaintiff has not proven up this point. This conclusion cannot be lightly assumed because there are some incongruities referenced in the ALJ's decision. Notably, Dr. Dietz concluded that Plaintiff "did not have rheumatoid arthritis" and told her to stop taking Methotrexate. R. 36, 820. Dr. Kozlowski, however, concluded that Plaintiff did have RA and re-started her on this medication. R. 834. Thus, at a minimum, these two treating rheumatologists did not agree on what would seem to be a key point.

Plaintiff makes another consistency argument, asserting that "Dr. Kozlowski's opinion closely follows that of Dr. Woodman's." Dkt. 22 at 15. But this conclusion is another one that has not been demonstrated by pointing to specific supporting evidence. It is true that both doctors opined generally that Plaintiff had limitations that might prevent her from working, but on

11

particular points, their opinions differ, both with each other and with Plaintiff's testimony. For example, Dr. Kozlowski wrote that Plaintiff's symptoms were "pain, back & joints, mild to moderate." R.795. In response to the question asking about Plaintiff's "most significant clinical findings and objective signs," Dr. Kozlowski wrote: "Bilateral Hip Pain. Tenderness, mild limitation." R. 795. He did not mention headaches, nausea, fatigue, or blurred vision. In contrast, Dr. Woodman did not mention the hip pain, but did refer to fatigue, migraines, and sleep issues. The two doctors differed on their assessments of how long Plaintiff could sit, stand, and walk. Dr. Woodman opined that Plaintiff could sit less than an hour in all three categories. Although this answer is roughly consistent with Plaintiff's testimony, it is not consistent with Dr. Kozlowski's answers. He opined that Plaintiff could sit four hours and could stand and walk two hours in a normal workday. R. 795. In sum, given these differences, Plaintiff's conclusory claim that these two opinions were consistent is subject to debate, and we therefore cannot fault the ALJ for not relying on this particular consistency argument.

The ALJ also found it inconsistent that Dr. Kozlowski stated on the form that Plaintiff "must" use a cane on "all surfaces." R. 796. The ALJ noted that this assertion was not only inconsistent with the doctor's statement elsewhere on this form that Plaintiff had no balance problems when walking, but was also inconsistent with the medical record, which contained no evidence that Plaintiff was either using, or needed to use, a cane. R. 41. Plaintiff responds as follows:

> *While Plaintiff does not use a cane*, she has decreased vibratory sense in her feet from diabetic neuropathy (TR. 312) and moderately severe arthritis in her hip (TR. 770). The client has been honest about the lack of an assistive device in the past. TR. 336. That being said, that doesn't mean that Dr. Kozlowski does not have a basis to determine that she should use a cane and certainly there is good reason for her to do so.

Dkt. 29 at 2 (emphasis added). This argument admits, right at the outset, the ALJ's main point that Plaintiff was not using a cane, which in turn raises the valid question of why Dr. Kozlowski believed Plaintiff was required to use one, which finally provides a reason for doubting the opinion as a whole. The rest of Plaintiff's argument is mostly speculation about whether perhaps she should start using a cane. Still, the basic fact remains—she was not using a cane and Dr. Kozlowski was apparently mistaken in believing otherwise.

Plaintiff also criticizes the ALJ for pointing out that Dr. Kozlowski's treatment notes stated that, although Plaintiff had tenderness, examinations repeatedly showed that she "had no swelling, warmth, erythema, or active synovitis." R. 41. The ALJ cited to the absence of such findings in the discussion of whether Plaintiff had an RA flare throughout the first three months of 2018. Plaintiff criticizes this reasoning, suggesting that synovitis, swelling, and fluid are not "major indicators" of RA. Dkt. 22 at 15-16. But Plaintiff has not provided support for this claim. Dr. Kozlowski himself made these findings and he put them in bold in his treatment notes, suggesting he thought they were significant. Also, the Court notes that several medical websites mention swelling and synovitis (the two appear to be synonyms) as important RA symptoms. For example, the Mayo Clinic website states the following:

Signs and symptoms of rheumatoid arthritis may include:

- Tender, warm, swollen joints
- Joint stiffness that is usually worse in the mornings and after inactivity
- Fatigue, fever and loss of appetite

Mayo Clinic, Rheumatoid arthritis, https://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/symptoms-causes/syc-20353648 (last visited Feb. 9, 2021); *see also* Medscape, Rheumatoid Arthritis (RA), https://emedicine.medscape.com/article/331715-overview (last visited Feb. 9, 2021) ("Rheumatoid arthritis (RA) is a chronic systemic inflammatory disease

13

whose *hallmark feature* is a persistent symmetric polyarthritis (*synovitis*) that affects the hands and feet[.]") (emphasis added).

Plaintiff also attacks a particular statement the ALJ made toward the end of the decision. It is the following:

> Overall, if the claimant were truly as limited as Dr. Kozlowski and Dr. Woodman indicate, the evidence would be replete with notes about falls or dropping things from her hands, atrophy, muscle wasting, bed sores, and swelling/edema due to fluid build up as well as consistent findings of reduced range of motion and strength.

R. 41. Plaintiff argues that the ALJ here was playing doctor by holding Plaintiff to an "impossible standard." Plaintiff's criticism about this statement is more persuasive than some of her other arguments because it is not clear that the absence of, for example, bed sores would be especially relevant to whether she could work full-time. Dr. Kozlowski did not mention this finding in his notes insofar as this Court can tell. However, it is not clear how much weight the ALJ put on the lack of findings about bed sores or muscle wasting or dropping things. Given all the other rationales that were relied on and that have been discussed above, the Court finds any error regarding this statement was harmless. *See, e.g., Matthews v. Saul* , __ Fed. App'x. __, 2020 WL 6495526, *5 (7th Cir. Nov. 5, 2020) (affirming even though "on certain points [the ALJ's] reasoning was not airtight").

Plaintiff has also raised a few other arguments. She complains about the RFC limitation that Plaintiff could use her hands frequently as opposed to occasionally and she argues that she had problems with muscle cramps and joint pain. Dkt. 22 at 22. Plaintiff also complains that the ALJ "did not appear to clearly confront" evidence about Plaintiff's hip and spinal conditions. *Id.* at 21. But Plaintiff's arguments are conclusory, and the ALJ's rationales discussed above are applicable to these issues as well. The record in this case is lengthy and complex with a long list

14

of symptoms that the ALJ had to address. Plaintiff has not shown that the ALJ ignored an entire line of evidence and has admitted that the ALJ considered both her testimony and at least some of the evidence favorable to her theory of the case. *Id.* at 20. On the whole, reading the ALJ's decision fairly and holistically, the Court finds that the ALJ did not commit any legal error and that there was substantial evidence, as that term is defined by *Biestek*, from which a reasonable mind could conclude that Plaintiff was not disabled.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is denied, the Commissioner's motion is granted, and the ALJ's decision is affirmed.

Date: February 10, 2021          By:

Lisa A. Jensen
United States Magistrate Judge

15